IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 24-** |
| v. | : | DATE FILED: _____ |
| **MARK SNEDDEN** | : | VIOLATIONS:<br>18 U.S.C. § 371 (conspiracy to commit |
| | : | federal program bribery – 1 count)<br>18 U.S.C. § 287 (making and presenting a |
| | : | false claim – 1 count)<br>18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

**INFORMATION**

**COUNT ONE**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

**BACKGROUND**

**Amtrak and Federal Funding**

1. Congress created the National Railroad Passenger Corporation, doing business as Amtrak, as a private, for-profit corporation, pursuant to the passage of the Rail Passenger Service Act of 1970, as amended, to operate a nationwide system of passenger rail transportation. Amtrak received significant federal funding through United States Department of Transportation ("DOT") grants to cover its activities associated with the Northeast Corridor and the National Network as authorized by the Fixing America's Surface Transportation Act (Div. A; Pub. L. No. 114-94).

2.      In addition to providing a substantial portion of Amtrak's funding, the federal government also provided oversight of how the funds were spent. The Federal Railroad Administration ("FRA"), as part of the DOT, administered the grants to Amtrak and provided federal oversight of Amtrak's grants. Amtrak's ownership and corporate structure were heavily controlled by the federal government. The United States government, through the Secretary of the DOT, owned all issued and outstanding preferred Amtrak stock.

3.      Pursuant to 49 U.S.C. § 24302, Amtrak's ten-member Board of Directors was comprised of the Secretary of the DOT; eight members nominated by the President of the United States and confirmed by the U.S. Senate; and the President of Amtrak, who was appointed by the members of the Board. In selecting individuals for nomination to the Board, the President was required to consult with the Speaker of the House of Representatives, the minority leader of the House of Representatives, the majority leader of the Senate, and the minority leader of the Senate to try to provide adequate and balanced representation of the major geographic regions of the United States served by Amtrak. These branches of the federal government exercised substantial supervision over Amtrak's operations. Amtrak was required to submit annual reports to Congress and the President of the United States detailing such information as route-specific ridership and on-time performance. Congress conducted oversight hearings to delve into details of Amtrak's budget, routes, and prices. In addition, the Freedom of Information Act (5 U.S.C. § 552) applied to Amtrak.

4.      Amtrak was substantially supported by federal funds. In 2016 and 2017, Amtrak received over $1,000,000,000 in federal appropriations each year. In 2018 and 2019, Congress approved Amtrak to receive approximately $1,950,000,000 each year in federal funding through DOT grants for the Northeast Corridor and the National Network.

## 30th Street Station Repair and Restoration Project

5.  Amtrak had a major railroad station located at 2955 Market Street in Philadelphia, Pennsylvania. The station was located at the intersection of 30th Street and Market Street and was commonly referred to as 30th Street Station. The construction of 30th Street Station began in 1929 and finished in 1933. In or about early 2015, companies were invited to bid on a project that would repair and restore the existing façade of 30th Street Station.

6.  On or about December 10, 2015, a masonry restoration contractor (the "Contractor"), who is known to the United States Attorney, was awarded a $58,473,000 contract by Amtrak to be the main contractor on this 30th Street Station façade repair and restoration project.

7.  Amtrak Employee #1, whose identity is known to the United States Attorney, was employed by Amtrak as the Project Manager on the repair and restoration project. In that capacity, Amtrak Employee #1 was responsible for communicating with the Contractor about the work being done on 30th Street Station.

8.  Amtrak Employee #1 was also responsible for reviewing the invoices, change orders, and requests for payment that the Contractor submitted to Amtrak. Amtrak Employee #1 had the power to approve or reject these invoices, change orders, and requests for payment. Although Amtrak Employee #1 did not have the singular authority to approve Amtrak payments to the Contractor, his approval was a critical step in that process.

9.  A change order was a written amendment to an existing contract after the effective date that altered the work, the contract sum, or the contract time. Amtrak referred to change orders as contract modifications.

10. Federal funding supplied approximately 90 percent of the money Amtrak used to pay the Contractor for the repair and restoration of the 30th Street Station façade.

### Contractor Officials

11. Defendant MARK SNEDDEN was the sole owner and President of the Contractor with responsibility to provide executive oversight of the Vice Presidents of the Contractor and the Contractor's performance on the 30th Street Station façade project.

12. Donald Seefeldt, Lee Maniatis, and Khaled Dallo, each charged elsewhere, were Vice Presidents of the Contractor, with responsibility to supervise the Contractor's performance on the 30th Street Station façade project.

13. The contract between Amtrak and the Contractor prohibited defendant MARK SNEDDEN and other Contractor officials from "offer[ing] to any Amtrak employee, agent, or representative any cash, gift, entertainment, commission, or kickback for the purpose of securing favorable treatment with regard to award or performance of any contract or agreement."

### THE CONSPIRACY

14. From in or about May 2016 through in or about November 2019, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### MARK SNEDDEN

conspired and agreed with others known and unknown to the United States Attorney, including Amtrak Employee #1, Lee Maniatis, Khaled Dallo, and Donald Seefeldt, to commit an offense against the United States, that is, to knowingly and corruptly give, offer, and agree to give, a thing of value to Amtrak Employee #1, an agent of an organization which received in each one-year period from 2016 through 2019, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, and other form of federal assistance, intending to

4

influence and reward Amtrak Employee #1 in connection with any business, transaction and series of transactions involving a thing of value of $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(2).

## MANNER AND MEANS

It was part of the conspiracy that:

15. Amtrak Employee #1, in his capacity as a project manager on the 30th Street Station Repair and Restoration Project, repeatedly demonstrated through his words and actions that he possessed the power and influence to approve, reject, and alter invoices, change orders, and contractor requests for payment.

16. Officials with the Contractor, including defendant MARK SNEDDEN, Donald Seefeldt, Lee Maniatis, Khaled Dallo, and others known to the United States Attorney, recognized that Amtrak Employee #1 possessed the power and influence to approve, reject, and alter invoices, change orders, and Contractor requests for payment, and communicated this among themselves.

17. Donald Seefeldt, Lee Maniatis, Khaled Dallo, and others known to the United States Attorney, with defendant MARK SNEDDEN's knowledge and agreement, provided Amtrak Employee #1 with gifts and other things of value totaling approximately $323,686, including, among other things, paid vacations, jewelry, cash, dinners, entertainment, and transportation, to ensure that Amtrak Employee #1 used his power and influence to benefit the Contractor during the performance of the 30th Street Station Repair and Restoration Project.

18. In return for these gifts and other things of value, Amtrak Employee #1 used his position at Amtrak to access internal agency information available only to Amtrak

5

employees about the 30th Street Station Project, and Amtrak Employee #1 shared this internal information with Donald Seefeldt, Lee Maniatis, Khaled Dallo, and other officials with the Contractor. The Contractor officials then passed on the information they received from Amtrak Employee #1 to defendant MARK SNEDDEN.

19. In return for these gifts and other things of value, Amtrak Employee #1 used his position at Amtrak to approve additional, more expensive changes to the 30th Street Station Repair and Restoration Project, thereby increasing the amount and value of the work to be performed by the Contractor. These additional expenses were reflected in a series of change orders or contract modifications. In total, Amtrak Employee #1 approved over $52 million of additional payments from Amtrak to the Contractor. Amtrak Employee #1 and officials with the Contractor falsely inflated the true costs of some of the work to be performed by the Contractor under these change orders, causing Amtrak to be substantially overbilled by over $2 million for the completion of the 30th Street Station Repair and Restoration Project.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objective, defendant MARK SNEDDEN, Donald Seefeldt, Lee Maniatis, Khaled Dallo, Amtrak Employee #1, and others known to the United States Attorney, committed the following overt acts, among others, in the Eastern District of Pennsylvania, and elsewhere:

1. On multiple occasions between on or about May 4, 2016, and on or about October 14, 2016, defendant MARK SNEDDEN authorized, approved, and directed various officials employed by the Contractor to give Amtrak Employee #1 various items of value,

including meals and associated entertainment, with an aggregate value of several thousand dollars.

2. On or about October 17, 2016, Amtrak Employee #1, in his capacity as project manager for Amtrak, requested that Amtrak authorize a change order for an additional approximate $13,397,324 in expenditures for the façade restoration project, with much of the requested funds to go to the Contractor.

3. On multiple occasions between in or about November 2016 and in or about December 2017, defendant MARK SNEDDEN authorized, approved, and directed various officials employed by the Contractor, to give Amtrak Employee #1 various items of value, namely, meals, associated entertainment, gift cards, limousine rentals, and alcohol, with an aggregate value of several thousand dollars.

4. On or about December 21, 2016, defendant MARK SNEDDEN sent a text message to Donald Seefeldt approving the purchase of a watch for Amtrak Employee #1. On or about January 17, 2017, Lee Maniatis purchased a Tourneau watch for approximately $5,631.25. Shortly thereafter, Maniatis and Seefeldt took Amtrak Employee #1 out to dinner and gave him the Tourneau watch.

5. On or about January 19, 2017, officials with the Contractor received notification that a change order requested by the Contractor had been approved by Amtrak. Lee Maniatis then sent a text message to Donald Seefeldt noting the change order approval and stating, "[d]inner was worth it."

6. On or about January 23, 2017, Lee Maniatis forwarded the notification of the approval of the change order to defendant MARK SNEDDEN with the notation, "$ ding."

7.  On or about January 26, 2017, Amtrak Employee #1 notified Lee Maniatis that Amtrak Employee #1 wanted another watch that cost approximately $6,000 more than the watch Amtrak Employee #1 had been given by Donald Seefeldt and Maniatis. Maniatis then sent a text message to Seefeldt informing him that Amtrak Employee #1 wanted another more expensive watch.

8.  As requested, on or about May 15, 2017, Lee Maniatis returned the original Tourneau watch and purchased another timepiece for approximately $11,294.38 and gave it to Amtrak Employee #1.

9.  In addition, on or about June 14, 2017, Lee Maniatis, with the knowledge and approval of defendant MARK SNEDDEN, paid various expenses related to an Ecuadorian vacation for Amtrak Employee #1 and certain companions of Amtrak Employee #1, including airfare, lodging, and a cruise excursion, with an aggregate value of several thousand dollars.

10. On or about November 14, 2017, Lee Maniatis paid, with the knowledge and approval of defendant MARK SNEDDEN, various expenses totaling $4,700 related to the purchase of a German Shepherd dog for Amtrak Employee #1.

11. On or about December 27, 2017, Amtrak Employee #1, in his capacity as project manager for Amtrak, requested that Amtrak authorize a second change order for an additional approximate $5,698,816 in expenditures for the façade restoration project, with much of the requested funds to go to the Contractor.

12. On or about December 29, 2017, Lee Maniatis paid, with the knowledge and approval of defendant MARK SNEDDEN, various expenses including airfare, related to a vacation to India for Amtrak Employee #1 and a relative of Amtrak Employee #1, with an aggregate value of several thousand dollars.

13. On multiple occasions between in or about January 2018 and in or about May 2018, various officials employed by the Contractor gave Amtrak Employee #1 various items of value, namely, cash, meals, associated entertainment, gift cards, limousine rentals, and alcohol, with an aggregate value of several thousand dollars.

14. On or about May 21, 2018, Amtrak Employee #1, in his capacity as project manager for Amtrak, requested that Amtrak authorize a third change order for an additional approximate $8,998,536 in expenditures for the façade restoration project, with much of the requested funds to go to the Contractor.

15. On multiple occasions between in or about May 2018 and on or about November 5, 2018, various officials employed by the Contractor gave Amtrak Employee #1 various items of value, namely, meals, associated entertainment, gift cards, limousine rentals, and alcohol, with an aggregate value of several thousand dollars.

16. On or about November 5, 2018, Amtrak Employee #1, in his capacity as project manager for Amtrak, requested that Amtrak authorize a fourth change order for an additional approximate $836,519.17 in expenditures for the façade restoration project, with much of the requested funds to go to the Contractor.

17. On multiple occasions from in or about June 2017 until in or about February 2019, defendant MARK SNEDDEN, with knowledge of the gifts and other things of value provided to Amtrak Employee #1 by Contractor officials, signed the change orders described above on behalf of the Contractor.

18. On multiple occasions between on or about November 7, 2018, and on or about March 28, 2019, various officials employed by the Contractor gave Amtrak Employee #1

various items of value, namely, meals, associated entertainment, gift cards, limousine rentals, and alcohol, with an aggregate value of approximately several thousand dollars.

19. On or about April 5, 2019, Amtrak Employee #1, in his capacity as project manager for Amtrak, requested that Amtrak authorize a fifth change order for an additional approximate $23,125,168.35 in expenditures for the façade restoration project, with much of the requested funds to go to the Contractor.

20. On or about August 29, 2019, Donald Seefeldt, Khaled Dallo, and Lee Maniatis helped coordinate a vacation trip to Chicago, Illinois for Amtrak Employee #1. Defendant MARK SNEDDEN agreed to pay the travel expenses for Amtrak Employee #1's trip to Chicago by having Dallo pay the travel expenses with the understanding that defendant SNEDDEN would reimburse Dallo.

21. On or about August 30, 2019, Khaled Dallo paid various expenses related to the Chicago, Illinois vacation for Amtrak Employee #1, including airfare and lodging, with an aggregate value of approximately $5,000.

22. On multiple occasions from on or about June 1, 2016, to on or about September 9, 2019, defendant MARK SNEDDEN and Donald Seefeldt, with knowledge of the gifts and other things of value provided to Amtrak Employee #1 by Contractor officials, signed pay applications seeking tens of millions of dollars from Amtrak for work completed by the Contractor, including work performed pursuant to the above-mentioned change orders.

23. On or about November 7, 2019, Amtrak Employee #1 emailed Donald Seefeldt an audio recording from a meeting between Amtrak Employee #1 and another Amtrak procurement official, which Amtrak Employee #1 secretly recorded. Seefeldt emailed the audio

recording to defendant MARK SNEDDEN for him to listen to the secretly recorded Amtrak procurement meeting.

24.     On multiple occasions between on or about April 28, 2019, and on or about November 13, 2019, various officials employed by the Contractor gave Amtrak Employee #1 various items of value, namely, meals, associated entertainment, gift cards, limousine rentals, and alcohol, with an aggregate value of several thousand dollars.

25.     On multiple occasions between in or about May 2016, and in or about November 2019, defendant MARK SNEDDEN reimbursed the various officials of the Contractor for the costs they incurred when purchasing the items of value provided to Amtrak Employee #1.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. The allegations contained in Paragraphs 1 through 13 and 15 through 19, and Overt Acts 1 through 25 of Count One of this information are re-alleged here.

2. On or about September 9, 2019, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

## MARK SNEDDEN

made and presented, caused to be made and presented, and aided and abetted the making and presenting of, a pay application claim to Amtrak, which is funded by the United States Department of Transportation, for payment of approximately $1,098,382.30 for work the Contractor allegedly performed through August 31, 2019, that is, the removal and abatement of asbestos containing material ("ACM") from Amtrak's window frames, knowing that the claim was false, fictitious, and fraudulent in that defendant SNEDDEN knew the Contractor had not performed the ACM removal and therefore was not authorized to be paid the approximate $1,098,382.30 for ACM removal.

In violation of Title 18, United States Code, Sections 287 and 2.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violation of Title 18, United States Code, Section 371, set forth in this information, defendant

**MARK SNEDDEN**

shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including, but not limited to the sum of approximately $1,472,393.57.

2. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred to, sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of this Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

*Christine E Ayers for*
**DAVID METCALF**
**UNITED STATES ATTORNEY**

No. _ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

MARK SNEDDEN

INFORMATION

Counts

18 U.S.C. § 371 (conspiracy to commit federal program bribery – 1 count)
18 U.S.C. § 287 (making and presenting a false claim – 1 count)
18 U.S.C. § 2 (aiding and abetting)
Notice of forfeiture

A true bill.

_____
Foreperson

Filed in open court this _____ day,
Of _____ A.D. 20_____

_____
Foreperson

Bail, $ _____