**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | CRIMINAL NO. 25-120 |
| **MARK SNEDDEN** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Jason D. Grenell, Assistant United States Attorney, respectfully submits this sentencing memorandum for defendant Mark Snedden, following his guilty plea to one count of conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 and making and presenting a false claim and aiding and abetting, in violation of 18 U.S.C. §§ 287 and 2. The defendant was the leader of a long-running and extraordinarily brash conspiracy to pay multiple bribes to an Amtrak official in exchange for millions of dollars in payments from Amtrak for fraudulently inflated invoices, all approved by the defendant. Following a thorough consideration of the facts of this case and the relevant sentencing factors set forth below, the government believes that a sentence within the applicable advisory Guidelines range is appropriate.

**I.     PROCEDURAL BACKGROUND**

On March 27, 2025, the U.S. Attorney's Office for the Eastern District of Pennsylvania filed a two-count Information charging the defendant, Mark Snedden, with conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 (Count One); and making and presenting a false claim and aiding and abetting, in violation of 18 U.S.C. §§ 287 and 2 (Count Two). A Notice of Forfeiture, ordering the defendant to forfeit any property or proceeds from the instant offense, including $1,472,393.57, accompanied the Information. On April 30, 2025,

the defendant appeared before the Honorable Wendy Beetlestone, waived prosecution by Indictment, and pled guilty to Counts One and Two of the Information.

## II.    LEGAL STANDARD

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006).

At the third step of the sentencing process, the Court must consider the advisory Guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors.........(A) rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

In consideration of the advisory Guidelines range and the Section 3553(a) factors discussed below, the government respectfully recommends a sentence within the applicable Guidelines range.

### III. <u>SENTENCING CALCULATION</u>

#### A. <u>Sentencing Guidelines Calculation</u>

The government agrees with the Probation Office's calculation of the sentencing Guidelines as to defendant Snedden. The defendant's criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, zero criminal history points establishes a criminal history category of I. PSR ¶ 57.

In this case, the Guideline for a violation of 18 U.S.C. § 371 is USSG §2C1.1, and it provides for a base offense level of 12 (because the defendant was not a public official). USSG §2C1.1(a)(2). PSR ¶ 43. Two points are added since the offense involved more than one bribe. PSR ¶ 44. The loss figure in this case is $2,062,374, which is more than $1,500,000 but less than $3,500,000, which results in 16 points being added. PSR ¶ 45. As the sole owner and President of the Contractor, the defendant had the final authority for authorizing contract modifications, expenditures, and payments to Amtrak Employee #1, and he was—at a minimum—the supervisor of Maniatis, Dallo, and Seefeldt's criminal activities; therefore, two levels are added. USSG §3B1.1(c). PSR ¶ 47. There is a collective three-level downward adjustment for acceptance of responsibility. PSR ¶ 51-2. With a criminal history category of I and an offense level of 29, the advisory Guideline range is 87 to 108 months' imprisonment. PSR ¶ 100.

### IV. GOVERNMENT'S RESPONSE TO DEFENDANT SNEDDEN'S OBJECTION

The defendant has voiced an objection to the Probation Office's calculation. The defendant alleges that he was not a leader or organizer in this case as he never personally met with Amtrak Employee #1 and that there is no clear connection between Snedden's leadership within the company and overseeing the criminal activity in this case. The defense also suggests that no such adjustment was in the plea agreement and so the adjustment should not apply.

First, the defendant agreed to the following during the recitation of the facts at his guilty

plea hearing.

> Defendant Mark Snedden was the sole owner and President of the Contractor with responsibility to provide executive oversight of the Vice Presidents of the Contractor and the Contractor's performance on the 30th Street Station façade project. From approximately May 2016 through approximately November 2019, the defendant conspired with Amtrak Employee #1 and other Contractor officials to knowingly and corruptly give things of value to Amtrak Employee #1, an agent of an organization that received federal benefits in excess of $10,000 in each one-year period from 2016 through 2019. The defendant and his co-conspirators did so intending to influence and reward Amtrak Employee #1 in connection with the 30th Street Station Repair and Restoration Project.

The defendant has thus plead guilty to being the sole owner of the Contractor, supervising the Vice Presidents, and conspiring with the Vice Presidents and Amtrak Employee #1 to commit these crimes. It is difficult to fathom how this conspiracy could have worked without Mark Snedden. Snedden did what a leader/organizer does. He was not involved in the day-to-day affairs but rather made the ultimate decision on what to approve or not approve. Snedden approved all the falsely inflated expense reports that were part of the criminal conduct in this case. He also admitted in his guilty plea colloquy that he knew of and approved bribes ranging from the German Shepherd given to Amtrak Employee #1, as well as that person's and his family's vacations to India.

Another consideration, as noted by the Probation Office, is who stood to profit the most from this criminal activity. Given the fee structure of the Contractor, Snedden stood to gain the most from this criminal activity. He more than anyone else profited from this conspiracy.

Finally, the lack of a stipulation between the parties does not mean that this enhancement is not appropriate. Paragraph 11 of the defendant's guilty plea agreement expressly provides that if the plea agreement is silent about an adjustment, the parties are free to argue for or against its applicability. By not entering into a stipulation regarding the applicability or inapplicability of adjustments under 3B1.1, both the United States and the defendant reserve their rights to argue for and against it. Probation is correct in this case. The adjustment is appropriately applied.

## V.     ANALYSIS

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the appropriate sentence for defendant Snedden is a sentence within the applicable Guideline range, plus a three-year term of supervised release, and full restitution in the amount of $2,062,374, joint and several with his co-conspirators. A fine should also be imposed by the Court, although the government defers to the Court on what the amount should be.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '(i)n the usual sentencing, the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range.'" *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion)). "Common sense indicates that, in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the Guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

        **1.     The nature and circumstances of the offense and the history and characteristics of the defendant.**

The defendant and his co-conspirators paid a staggering number of bribes to an Amtrak employee to obtain millions of dollars through the submission of bogus invoices. Those millions were paid to the defendant and the company that he owned. Not only did Snedden own the company but, given the bonus structure, he earned the most from this criminal activity. Defendant Mark Snedden was the sole owner and President of the Contractor with responsibility to provide executive oversight of the Vice Presidents of the Contractor and the Contractor's performance on the 30th Street Station façade project. In December 2015, the Contractor was awarded a roughly $58,000,000 project to renovate 30th Street Station, a beloved and historic station in our city. The project was a major project for both Amtrak and the Contractor.

Soon after work began at 30th Street Station, an Amtrak employee, named here and in other filings as "Amtrak Employee #1," approached officials at the company and made requests for things of value in exchange for help and cooperation. It soon became clear to Snedden, along with Donald Seefeldt, Lee Maniatis and Khaled Dallo, all subordinate to him, that to get things done, and done fast, they were going to have to bribe Amtrak Employee #1. And that's exactly what they conspired to do. In total, Snedden and his co-conspirators provided Amtrak Employee #1 with approximately $323,686 in gifts, dinners, and other things of value. The bribes started out relatively small but escalated quickly. From May 2016 through roughly October 2016, Maniatis and Dallo paid for roughly $7,800 in dinners and entertainment. From October 2016 through December 2016, Seefeldt joined Dallo and Maniatis in paying for

roughly $2,500 in meals, entertainment, gift cards, limousine rentals and alcohol. One of the more powerful and explicit bribes in this case happened on January 17, 2017, when Maniatis and Seefeldt took Amtrak Employee #1 to dinner and gave Amtrak Employee #1 a watch valued at $5,631.25. After the dinner and Amtrak Employee #1's receipt of the expensive watch, on January 19, 2017, Amtrak Employee #1 had a contract modification approved for the Contractor that resulted in additional payments to the company. In response, Maniatis texted Seefeldt stating, "[d]inner was worth it." Just days later after the contract modification was approved, Maniatis forwarded the notification to Snedden with the notation, "$ ding."

Snedden and his co-conspirators knew that what they were doing was illegal and constituted a bribe. Amtrak had provided each of them with materials that stated that nothing of value could be given to Amtrak employees by contractors. There was no ambiguity. The conspirators, including defendant Snedden, bribed Amtrak Employee #1 so that, collectively and individually, they could make millions of dollars.

Snedden is particularly culpable in this case, and in many ways his conduct is more egregious. First, Snedden stood to profit the most from this criminal activity. This was thus a deliberate calculation by Snedden. Snedden made the choice to bribe Amtrak Employee #1 because he wanted more money. His crimes were not committed out of necessity. They were crimes of greed. The scheme was completely unnecessary as Snedden was already a millionaire many times over at the time. He just wanted more money.

Second, Snedden cannot claim that he had no options or that he was being bullied by Amtrak Employee #1. Prior to committing the crimes at issue in this case, Snedden had multiple meetings with the previous federal prosecutor assigned to this case about an unrelated matter. In fact, Snedden was a witness for that prosecutor. During those dealings Snedden had the contact information for not only an AUSA assigned to a corruption group

- 7 -

but also the contact information for an FBI agent assigned to corruption matters. While it is often argued that defendants could have contacted the authorities and avoided the criminal conduct altogether, here it must be noted that Snedden had even fewer barriers to making that contact here. Snedden could have called, texted, or emailed either of these two people and quickly brought an end to this corrupt conduct. Snedden chose not to do those things and instead bribed Amtrak Employee #1. The reason is clear. If Snedden reported the conduct, he was not going to make as much money than if he just bribed Amtrak Employee #1.

Since this investigation became overt, it is true that Snedden took steps to accept responsibility and work with the government. Snedden pled guilty to an Information and that certainly deserves a degree of credit, which is taken into account in his Guidelines calculation pursuant to USSG 3E1.1. Snedden also authorized the law firm he hired to represent his company to provide information to the government, knowing full well that the information could be used against him. There is a distinction between Mark Snedden the individual and the Contractor. Outside counsel represented the Contractor, and counsel's work with the government did cause the Contractor to receive an extraordinary benefit: the Contractor was not charged criminally. To the extent that defendant Sneddoe now wishes to have the additional benefit of personally benefitting from the information sharing by the Contractor's counsel, he has already received it, too. His business, which he still owns, is still operational and continues to make him money, personally.

The government acknowledges Snedden's post-criminal conduct acceptance of responsibility and willingness to provide information. There was nothing so extraordinary or unusual about the defendant's acceptance that weighs in favor of sentencing mitigation beyond that already taken into account by the Guideline calculation.

Moreover, the length of time that the defendant was involved in these crimes (years) and the high volume of deceitful and dishonest acts by him and others call out for a significant sentence within the Guideline range. Defendant Snedden's criminal conduct was not a single, hasty, careless act done without any forethought. Over a significant period of time, the defendant and his co-conspirators planned and calibrated their bribes to attain the outcomes they desired.

> **2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The defendant committed a very serious offense. The sentence needs to be commensurate with the defendant's actions. This case did not involve a temporary lapse in judgment. This was a years-long offense in which each of the defendants, including Snedden, had an opportunity to abandon the conspiracy. Snedden has acknowledged that he does not have "any excuses," and knows what he did, "was wrong." PSR ¶ 38. This is a case where a serious prison sentence is warranted, especially given the number of years this conduct went on, at great expense to Amtrak. As stated above, Snedden had an opportunity to contact federal authorities that he already knew, but he chose not to. Snedden was not interested in stopping corruption. He was interested in making money. He only stopped committing crime because he was caught. But for getting caught, his crimes would have continued, and the losses to Amtrak would have continued to accumulate.

This sentence should also promote respect for the law. This is particularly important in this case where the defendant and his co-conspirators were making efforts to avoid getting caught. On or about August 23, 2019, Dallo flew to Midway Airport in Chicago to meet with Snedden and Maniatis. During the meeting Dallo told Snedden and Maniatis that Amtrak Employee #1 was upset because Amtrak Employee #1 was not making nearly as much money as the Contractor executives. Snedden asked how much Amtrak Employee #1 wanted to which Dallo said,

"$500,000." Maniatis disagreed and believed the number was closer to two million. At the end of the conversation Maniatis frisked Dallo, and Maniatis asked Dallo if he was "wired." After Dallo was frisked, Snedden told Dallo to tell Amtrak Employee #1 that Dallo had been unable to meet with either Snedden or Maniatis. This interaction shows a calculating, cautious, and corrupt group of individuals. Everyone in this conspiracy, including Snedden, was taking steps to avoid detection so that they could collectively become wealthier through their criminal activity. The person who stood to profit the most was Snedden.

> **3.     The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The sentence the Court imposes should provide both specific and general deterrence to criminal conduct.  The defendant's actions in this case warrant an appropriate sentence to prevent him, and others, from committing further crimes. Specific deterrence does not seem to be the greatest consideration in the defendant's case. Given the defendant's age and his potential prison sentence, he is unlikely to commit similar criminal conduct in the future. His otherwise crime-free life also seems to indicate that he won't be conspiring to bribe anyone else. This sentence, though, should be crafted with general deterrence in mind. Economic crimes like this are highly calculated by their participants. More than many other types of criminals, well-educated and savvy individuals like the defendant who are contemplating committing an economic crime conduct a careful cost-benefit analysis of punishment versus reward. The sentence this Court imposes should make clear to others considering similar criminal conduct that the reward does not outweigh the risk. A Guideline sentence certainly accomplishes that goal.

> **4.     The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need "to provide the defendant with needed educational or vocational

training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(D). The defendant is a well-educated and well-adjusted 70-year-old man. He does appear to have some medical issues and possibly a substance abuse issue. These issues are within the range of issues that the Bureau of Prisons is capable of managing and should not affect his sentence. Rather, they are appropriately considered in the context of what services the defendant should be afforded while incarcerated.

    **5.    The Guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

A Guideline sentence will not create an unwarranted disparity in this case. The Sentencing Guidelines aim to achieve uniform and appropriate treatment of like crimes, represent the distillation of more than 20 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. All these policy reasons support the imposition of a sentence of imprisonment within the applicable Guideline range in this case. 18 U.S.C. § 3553(a)(6).

## VI.    CONCLUSION

In sum, all of the appropriate considerations of sentencing favor the imposition of a sentence within the applicable Guidelines range of 87 to 108 months' imprisonment, followed by a term of supervised release of three years.

                                                      Respectfully submitted,

                                                      DAVID METCALF
                                                      United States Attorney

                                                      */s Jason D. Grenell*
                                                      JASON D. GRENELL
                                                      Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that this sentencing memorandum has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

Amy B. Carver, Esquire
Catherine M. Recker, Esquire
306 Walnut Street Philadelphia, PA 19106
abcarver@welshrecker.com
cmrecker@welshrecker.com

Joseph Duffy, Esquire
Robin Waters, Esquire
321 North Clark Street, Suite 2300
Chicago, IL 60654
jduffy@loeb.com
rwaters@loeb.com

                                              */s Jason D. Grenell*
                                              JASON D. GRENELL
                                              Assistant United States Attorney

DATED:  September 23, 2025